

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **INDICTMENT** |
| Plaintiff, | ) | **1:07CR 647** |
| v. | ) | VIOLATION:<br>18 U.S.C. § 956(a)(1) |
| ZUBAIR AHMED and<br>KHALEEL AHMED, | ) | **JUDGE ADAMS** |
| Defendants. | ) | |

## COUNT 1

The Grand Jury charges that:

1.    From at least as early as April 2004 through the date of this indictment, in the Northern District of Ohio, Eastern Division, and elsewhere, the defendants, ZUBAIR AHMED and KHALEEL AHMED, together and with others known and unknown to the Grand Jury, did willfully combine, conspire, confederate and agree to kill or maim persons in locations outside of the United States.

### Manner and Means

2.      It was a part of the conspiracy that the defendants made preparations for travel and did travel together overseas to engage in violent jihad.

3.      It was a further part of the conspiracy that the defendants devised a long term plan for personal preparation and training to engage in violent jihad overseas, including but not limited to physical development, weapons training, financial planning, and debt reduction and capitalization.

4.      It was a further part of the conspiracy that one or more of the defendants researched and purchased or attempted to purchase a firearm.

5.      It was a further part of the conspiracy that the defendants engaged in physical development, bodybuilding, and endurance and strength training, including but not limited to the use of steroids and nutritional supplements.

6.      It was a further part of the conspiracy that the defendants engaged in firearms training, including but not limited to the rental and use of weapons at indoor shooting ranges.

7.      It was a further part of the conspiracy that one or more of the defendants researched, planned, prepared, and promoted various means, methods and sources for attaining a level of financial independence for the purpose of enabling the conspirators to pursue the ultimate objectives of the conspiracy.

8.      It was a further part of the conspiracy that the defendants sought and obtained instruction, information, materials and advice regarding weapons, tactics, counter-surveillance, and related topics, from multiple sources, including but not limited to communicating with like-minded individuals for the purpose of sharing and applying such information.

2

9.     It was a further part of the conspiracy that the defendants attempted to conceal the conspiracy and their activities in furtherance of the conspiracy by making false statements, including omitting material facts, to government agents and officials.

10.     It was a further part of the conspiracy that the defendants used coded or discreet communications, spoke in a foreign language, and employed other counter-surveillance techniques for the purpose of concealing the conspiracy and their activities.


Overt Acts

11.     In furtherance of the conspiracy, and to affect the illegal objects thereof, at least one of the conspirators knowingly performed one or more overt acts in the Northern District of Ohio, Eastern Division, and elsewhere within the United States, including but not limited to the following:

12.     On or about April 20, 2004, ZUBAIR purchased round trip airline tickets for himself and KHALEEL, for travel on May 21, 2004, from Chicago, Illinois to Cairo, Egypt, with a stop-over in Istanbul, Turkey, and a scheduled return to Chicago on August 18, 2004.  The total cost of the two round-trip tickets was approximately $1,725.

13.     On or about May 15, 2004, KHALEEL quit his job as a Retail Communications Consultant at Sprint.

14.     On or about May 17 and 18, 2004, ZUBAIR communicated with an individual from Toledo, Ohio, ("Separately Indicted Co-Conspirator A," hereafter), whose identity is known to the Grand Jury, regarding a proposed business strategy involving anaerobic composting and renewable waste management.  The business plan was proposed as a potential income-producing

3

enterprise, and was subsequently offered by ZUBAIR and KHALEEL as a cover story for their trip to Egypt.

15.     On or about May 21, 2004, ZUBAIR and KHALEEL boarded Turkish Airlines flight number 6 in Chicago, Illinois, bound for Istanbul, Turkey.

16.     On or about May 23, 2004, ZUBAIR and KHALEEL arrived in Cairo, Egypt. Within days, they were intercepted in Cairo by Separately Indicted Co-Conspirator A and ZUBAIR's father, among others.

17.     On or about June 2, 2004, ZUBAIR and KHALEEL returned to Chicago, Illinois from Cairo, Egypt, through Istanbul, Turkey, on Turkish Airlines flight number 5. ZUBAIR had in his possession, upon arrival in Chicago, approximately 13 bottles containing steroid tablets.

18.     On or about July 3, 2004, ZUBAIR and KHALEEL traveled from Chicago, Illinois, with Separately Indicted Co-Conspirator A, to a convention in Cleveland, Ohio. There, Separately Indicted Co-Conspirator A introduced them to an individual with a military background who could provide them with weapons, tactical, and other military-style training. (This individual, whose identity is known to the Grand Jury; was a government cooperating witness, identified for purposes of this indictment as "the Trainer," hereafter).  Shortly after arrival at the conference site, ZUBAIR, KHALEEL, and Separately Indicted Co-Conspirator A met briefly with the Trainer, and made arrangements to meet later for further discussion.

19.     On or about July 4, 2004, ZUBAIR and KHALEEL discussed sniper tactics with the Trainer, and their desire to receive training in, among other things, firearms and counter-surveillance techniques. ZUBAIR explained his desire to learn to use a .50 caliber machine gun, or Gatling gun. KHALEEL discussed with the Trainer the wisdom of purchasing a 9 millimeter

4

handgun for training. The Trainer recommended that ZUBAIR and KHALEEL start training with a .22 caliber weapon, instead. ZUBAIR advised the Trainer, in part and in substance, that they would communicate in the future by encrypted e-mails. ZUBAIR stated, in part and in substance, to Separately Indicted Co-Conspirator A, ". . . man, we've been waiting for this." ZUBAIR also stated, in part and in substance, "I'm making a five year plan . . . so we'll keep staying in shape and keep doing our thing." During the meeting, ZUBAIR and KHALEEL received firearms instruction from the Trainer, including but not limited to advice on the type of weapon to use for their initial training exercises. ZUBAIR also expressed his need to acquire a Firearms Owners Identification Documentation card, ("FOID card," hereafter).

20.     On or about August 5, 2004, ZUBAIR applied for a FOID card. FOID card number 52171170 was issued to ZUBAIR on September 24, 2004. KHALEEL had previously been issued FOID card number 33121092.

21.     In or about September 2004, ZUBAIR and the Trainer exchanged telephone messages in attempts to contact each other.

22.     On or about September 7, 2004, ZUBAIR communicated by e-mail with an individual from Atlanta, Georgia ("Subject B," hereafter). In the e-mail exchange, ZUBAIR and Subject B discussed, in part and in substance, the need to prepare for "the final war of Islam," and "the true path to achieve that." ZUBAIR advised Subject B that ZUBAIR had met "some other good people." ZUBAIR suggested that they talk further in person.

23.     On or about September 8, 2004, ZUBAIR communicated with Subject B by e-mail. In the e-mail exchange, ZUBAIR and Subject B discussed, in part and in substance, their respective plans for reaching the "third" level, their code word for active participation in violent

5

jihad. ZUBAIR advised, in part and in substance, that they needed to be patient, and stated that ZUBAIR and KHALEEL had not given up on reaching the third level and were going to work harder toward achieving that goal.

24.     On or about October 2, 2004, ZUBAIR stated to the Trainer that he had prepared a written list of questions and provided them to Separately Indicted Co-Conspirator A to be forwarded to the Trainer for the Trainer's responses. ZUBAIR explained to the Trainer that he was still interested in receiving training, but had been unable to come to Ohio. ZUBAIR stated, in part and in substance, "If you can come down here [Chicago], I'll hook you up with a hotel and everything." ZUBAIR further stated, in part and in substance, that he and KHALEEL needed to receive "knowledge" from the Trainer, so that they could continue to prepare on their own in Chicago and then "hook up" with the Trainer in the Spring. ZUBAIR instructed the Trainer to obtain the questions from Separately Indicted Co-Conspirator A.

25.     On or about December 25, 2004, ZUBAIR communicated by e-mail with Subject B. In the e-mail exchange, Subject B invited ZUBAIR to come down to visit him. ZUBAIR responded that he was too busy with work and school, but hoped to visit in the Spring. ZUBAIR advised that he was going to send Subject B more CDs. ZUBAIR stated, in part and in substance, that he was also organizing a group from his base.

26.     On or about December 26, 2004, KHALEEL contacted the Trainer to explain why ZUBAIR and KHALEEL had been unable to train in Ohio. KHALEEL advised that Separately Indicted Co-Conspirator A had attempted to set up a meeting in Chicago for all four of them.

27.     On or about January 23, 2005, ZUBAIR communicated by e-mail with Subject B. Subject B invited ZUBAIR to "come and see our preparation" for violent jihad. ZUBAIR

6

responded, in part and in substance, that he had also found a person to provide training, and that his "tutor" stated ZUBAIR could "start big." ZUBAIR indicated that he hoped to visit Subject B in a couple weeks.

28.     On or about March 1, 2005, ZUBAIR advised Subject B that he was saving money to come visit him.

29.     On or about March 1, 2005, ZUBAIR and Subject B communicated by e-mail. Subject B suggested that ZUBAIR come prepared to participate in training exercises in the mountains. ZUBAIR agreed with the plan, stating, in part and in substance, that good things happen when you are patient.

30.     On or about March 13, 2005, ZUBAIR communicated by e-mail with Subject B. Subject B advised ZUBAIR that he had just returned from some place he didn't want to mention online and met with people there. Subject B further advised that they would talk more in person, and that ZUBAIR could come any time. ZUBAIR responded that they had lots of time, and encouraged Subject B to continue his preparations.

31.     On or about March 15, 2005, ZUBAIR exchanged a series of e-mails with Subject B addressing issues of finances and debt. They discussed, in part and in substance, whether they could apply for loans, use the proceeds, and then default on the loans. ZUBAIR advised, in part and in substance, that he had previously believed it was a viable option, but that he was reconsidering after hearing an Islamic scholar state that they could be held accountable on judgment day, and that religious fighters cannot reach paradise if they owe debt. ZUBAIR also advised that their respective families will never understand their participation in violent jihad, citing his experience with his family when he and KHALEEL went to Egypt. ZUBAIR stated, in

7

part and in substance, that they need to achieve financial independence for their households so that they are free to engage in violent jihad. ZUBAIR also indicated that they need to have good solid contacts in order to be successful, and advised Subject B that he could connect him with a contact ZUBAIR had made in Atlanta.

32.     On or about June 17, 2005, ZUBAIR exchanged e-mails with Subject B regarding the amount of Subject B's debts. In addition, ZUBAIR informed Subject B that he was going to Morocco to visit his fiancee'. ZUBAIR advised, in part and in substance, that he hoped his fiancee' would support his jihad ambitions.

33.     On or about August 22, 2005, ZUBAIR exchanged e-mails with Subject B regarding Subject B's recent travel to Pakistan. ZUBAIR inquired about the position of the religious scholars in Pakistan regarding violent jihad. ZUBAIR also encouraged Subject B to acquire wealth, as "there's much to do."

34.     On or about December 2, 2005, ZUBAIR communicated by telephone with Subject B. During the conversation, ZUBAIR stated, in part and in substance, that he and KHALEEL were still serious about engaging in violent jihad, and that the three of them should get together. ZUBAIR advised that it would take another year for he and KHALEEL to pay off the debt incurred from their trip to Egypt. ZUBAIR advised that they had taken $10,000 with them to Egypt. ZUBAIR requested Subject B to call him later that day. During parts of the conversation, ZUBAIR and Subject B spoke in the Urdu language.

35.     On or about December 2, 2005, ZUBAIR again communicated by telephone with Subject B. They discussed, among other things, their problems with their respective parents. ZUBAIR stated, in part and in substance, that it is a problem that he is his father's only son.

8

ZUBAIR again advised that he and KHALEEL needed five more years to complete their preparations for violent jihad.  ZUBAIR also reminded Subject B, in part and in substance, that good connections were needed in order to accomplish their jihad mission.  Subject B and ZUBAIR discussed the signs of the coming of the end times, and ZUBAIR stated, in part and in substance, that he believed the final judgment wouldn't occur for another five years.  Subject B recommended that ZUBAIR read the recently disclosed Jose Padilla indictment in order to take appropriate counter measures against the government's investigative techniques revealed therein. ZUBAIR and Subject B discussed their concerns that their telephones were monitored by the government and agreed that they should use telephones listed in other persons' names to counter that surveillance.  During parts of the conversation, ZUBAIR and Subject B spoke in the Urdu language.

36.     On or about December 2, 2005, KHALEEL and ZUBAIR communicated by telephone and, in part and in substance, agreed that they should travel to Atlanta to meet with Subject B in the Spring.

37.     On or about February 1, 2006, KHALEEL and ZUBAIR communicated by telephone and, in part and in substance, agreed that they needed to make another attempt to engage in violent jihad.  During portions of the discussion, KHALEEL and ZUBAIR spoke in the Urdu language.

38.     On or about February 6, 2006, KHALEEL and ZUBAIR communicated by telephone.  They discussed, among other things, an on-line instructional program for gun smithing.  KHALEEL stated, in part and in substance, "Wouldn't it be too obvious if we take this damn class?"  ZUBAIR replied, in part and in substance, that taking the course is not against the

9

law and that, even if it raises suspicion, "suspicion is not enough for arrest." ZUBAIR advised KHALEEL to review the gun smithing program on-line, and then look for books that teach the subject so that they can learn it on their own. During portions of the discussion, KHALEEL and ZUBAIR spoke in the Urdu language.

39.     On or about February 6, 2006, ZUBAIR and KHALEEL communicated by telephone. KHALEEL advised, in part and in substance, that he was cleaning up his computer e-mail files to remove e-mails referencing their May 2004 trip to Egypt. ZUBAIR replied, in part and in substance, that he deleted those e-mails from his computer immediately upon their return from overseas. During portions of the discussion, KHALEEL and ZUBAIR spoke in the Urdu language.

40.     On or about February 19, 2006, ZUBAIR and KHALEEL communicated by telephone. They discussed, among other things, different types of firearms and the preferable locations for purchasing guns. KHALEEL advised, in part and in substance, that he wanted to purchase a gun by the Summer. KHALEEL advised, in part and in substance, that he had researched and determined that it was better to purchase a gun in Illinois than in Michigan. ZUBAIR instructed KHALEEL that when KHALEEL is at Gurnee Mills, a mall located in Illinois, he should check with the Bass Pro Shops there to determine if they carry the WASR-10, a 9mm carbine variant of the AK-47 tactical weapon. ZUBAIR informed KHALEEL that it is possible to shoot a 9mm firearm at a range located in Bensenville, Illinois. ZUBAIR expressed concern about his father finding out about the gun and told KHALEEL, in part and in substance, that he would hide it from his father. KHALEEL suggested that ZUBAIR could store the gun in KHALEEL's rented storage unit. ZUBAIR stated, "I want it so bad." ZUBAIR advised, in part

10

and in substance, that if they go to Peoria to buy firearms, ZUBAIR wants to take enough money

to purchase two guns. During portions of the discussion, KHALEEL and ZUBAIR spoke in the

Urdu language.

41.     On or about February 20, 2006, ZUBAIR and KHALEEL communicated by

telephone. KHALEEL informed ZUBAIR, in part and in substance, that Bass Pro Shops did not

carry the WASR-10 tactical weapon, but that the store did sell shotguns, handguns, and

revolvers, including the "Desert Eagle" .50 caliber handgun. ZUBAIR stated, in part and in

substance, that he couldn't believe that the Trainer had recommended that they start training with

a .22 caliber weapon, because ZUBAIR considered the gun too small. ZUBAIR advised, in part

and in substance, that he had fired an "AK," (referring to an AK47 model weapon), in Las Vegas.

ZUBAIR told KHALEEL, in part and in substance, that the kickback from the AK47 was like

getting punched lightly on the shoulder, and that KHALEEL could handle it. ZUBAIR and

KHALEEL discussed, in part and in substance, obtaining a Glock handgun. ZUBAIR stated that

he would want 15 round clips. During portions of the discussion, KHALEEL and ZUBAIR

spoke in the Urdu language.

42.     On or about February 21, 2006, ZUBAIR and KHALEEL communicated by

telephone. ZUBAIR advised KHALEEL, in part and in substance, that he had heard a radio

report of the arrest of Separately Indicted Co-Conspirator A, and others. ZUBAIR told

KHALEEL, in part and in substance, that Separately Indicted Co-Conspirator A could have

gotten them in big trouble. ZUBAIR stated, in part and in substance, that Separately Indicted Co-

Conspirator A was a hypocrite because he took $50,000 from Zubair's father to prevent them

from engaging in violent jihad. ZUBAIR stated, in part and in substance, that a true Muslim

would not have helped ZUBAIR's father. KHALEEL asked, and ZUBAIR confirmed, that the arrested individuals were the same people they had met at the convention in Cleveland, Ohio, in July 2004. ZUBAIR and KHALEEL agreed to discuss the matter further in person. During parts of the conversation, ZUBAIR and KHALEEL spoke in the Urdu language.

43.     On or about March 9, 2006, ZUBAIR provided false, misleading, and incomplete information to federal agents regarding his May 2004 trip to Egypt with KHALEEL, including but not limited to concealment of their contact in Egypt with Separately Indicted Co-Conspirator A.

44.     On or about March 10, 2006, ZUBAIR provided false, misleading, and incomplete information to a federal agent regarding his involvement in violent jihad planning and preparation, including but not limited to his false representation that the term "third," as used in communications between ZUBAIR and Subject B, was a reference to weight lifting rather than their code word for participation in violent jihad.

45.     On or about March 14, 2006, KHALEEL provided false, misleading, and incomplete information to federal agents regarding his May 2004 trip to Egypt with ZUBAIR, including but not limited to concealment of their contact in Egypt with Separately Indicted Co-Conspirator A.

46.     On or about September 23, 2006, ZUBAIR and KHALEEL rented firearms, including but not limited to a .22 caliber Ruger MK II, serial # 223-90151, and a .22 caliber Ruger II, serial # 219-51042, and purchased ammunition, at Gun World, an indoor shooting range located in Bensenville, Illinois.

47.     On or about September 24, 2006, ZUBAIR purchased a firearm, specifically a

"Glock G23" .40 caliber handgun, for approximately $593.49, at Bass Pro Shops Outdoor World located at the Gurnee Mills mall, in Gurnee, Illinois. ZUBAIR was unable to take physical possession of the handgun until after the expiration of the legally required three-day waiting period.

48.     On or about September 26, 2006, ZUBAIR and KHALEEL communicated by telephone. KHALEEL and ZUBAIR used code words to discuss ZUBAIR's purchase of the handgun. ZUBAIR, in part and in substance, advised KHALEEL that he had not yet received the weapon, reminding him that only two days had passed since the purchase.

49.     In or about November 2006, ZUBAIR participated in firearms shooting practice at The Outdoorsman Sport Shop, an indoor shooting range located in Winthrop Harbor, Illinois, including the purchase of full-size body targets and ammunition, and the rental of .22 caliber and .50 caliber handguns.

50.     During the period of the conspiracy, ZUBAIR and KHALEEL acquired, viewed and stored on computers and other data storage media, electronic data and media files containing, among other things, videos depicting violent encounters between United States military or coalition forces and religious fighters and insurgency groups in Iraq, Afghanistan, and elsewhere; electronic copies of United States military publications depicting tactics, equipment and weaponry, including but not limited to information about .50 caliber sniper rifles, night vision goggles, and toxic materials;  books, articles, manuals, and materials regarding body-building, steroids, and physical fitness and strength training; and videos, books, articles and treatises

13

regarding jihad-related topics, including but not limited to information regarding the construction of a suicide bomb vest, the "Book of a Mujahiddeen," and "The Book of Jihad."

In violation of Title 18, United States Code, Section 956(a)(1).

A TRUE BILL.

Original document – Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.